FILED

# IN THE UNITED STATES DISTRICT COURT
# FOR NORTHERN DISTRICT OF WEST VIRGINIA

NOV 0 5 2024

U.S. DISTRICT COURT WVND
MARTINSBURG, WV 25401

IN THE MATTER OF THE SEARCH OF
THE FOLLOWING CELLULAR DEVICE
CURRENTLY LOCATED AT THE ATF
MARTINSBURG FIELD OFFICE IN
MARTINSBURG, WEST VIRGINIA:

(1) A BLUE APPLE IPHONE;

(2) A BEIGE APPLE IPHONE WITH
    GREY CASE AND VARIOUS
    WRITING; AND

(3) A BLACK APPLE IPHONE WITH
    CRACKED BACK.

CASE NO.: 3:24-MJ-118

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Lauren Scoll, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of property— electronic

devices—which are currently in law enforcement possession and further described in Attachment

A, and the extraction from that property of electronically stored information described in

Attachment B.

2.    I became a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

1

Explosives ("ATF") in March 2005. I had a voluntary break in service in 2013, and I was reinstated in February 2021. I am a graduate of the Criminal Investigator Training Program and ATF's Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia. This included training in the investigative techniques of criminal violations of the Gun Control Act (18 U.S.C ch. 44) and the National Firearms Act (26 U.S.C. ch. 53). Prior to becoming a Special Agent, I was an investigator for a private investigation firm and an ATF Industry Operations Inspector in California. I have a Bachelor of Arts in Communication Disorders and Sciences from California State University, Northridge.

3.      I have conducted covert surveillance of suspected firearms and controlled dangerous substances ("CDS") traffickers, interviewed individuals regarding the firearms/CDS trafficking trade, participated in the execution of numerous state and federal search warrants, and participated in the seizure of numerous firearms and CDS. Through my training, education, and experience, I have become familiar with the manner in which illegal firearms and CDS are obtained, transported, stored, and distributed, and the manner in which firearms and CDS traffickers communicate with each other. Through my training, education, and experience, I have also become familiar with use of firearms in CDS trafficking and usage.

4.      Through my training and experience, I have become familiar with the methods of operations typically utilized by individuals who illegally obtain and possess firearms and distribute CDS and possess firearms. I know that it is common practice for firearm and CDS traffickers to routinely utilize telephones, mobile phones, prepaid phones, text messaging, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the

2

detection of law enforcement. Moreover, it is not unusual for these subjects to register services such as telephones or vehicle registration in the name of an associate or other family member or in the name of a fictitious individual.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(6) (false statement in the acquisition of a firearm), 18 U.S.C. § 922(g)(3) (unlawful user of narcotics in possession of a firearm), 18 U.S.C. § 932 (straw purchasing of firearms), and 18 U.S.C. § 371 (conspiracy) have been committed, are being committed, and will be committed by the individuals known to law enforcement as Christopher Seth STCLAIR, Autumn Jade BURTON, Donaven Eugene SIMMS, and David Lamont BARNES, and evidence of these violations are in the property to be searched in Attachment A. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations.

**Knowledge About Firearms Trafficking**

7.     Based on my training, professional education, and experience, I have learned the following about the distribution of firearms and the methods of operation of individuals involved in illegal firearms trafficking:

   a.  Federal Firearm Licensees ("FFL"), which are licensed to deal firearms and are regulated by the ATF, are required to have prospective non-licensed and nonpermitted

3

firearm purchasers complete ATF Form 4473 (Firearms Transaction Record). The FFL also requires photo identification from each purchaser at the time of transfer. The Firearms Transaction Record requires each purchaser to answer basic biographical questions about him/herself as well as questions about prior criminal convictions and/or conduct that may prohibit their possession of firearms. Once that information is communicated to the FFL, the FFL then contacts the Federal Bureau of Investigation (FBI) National Instant Check System (NICS) to see if the prospective buyer is prohibited from purchasing or possessing firearms. If the prospective buyer is not prohibited, the firearm is immediately transferred. If there is a question as to their prohibited status, the transfer can be delayed for up to three business days. If the person is clearly prohibited, the firearm transaction is immediately denied.

b.  Individuals who are prohibited from possessing firearms or who unsuccessfully attempt to acquire firearms through FFLs very often pursue illegitimate channels to acquire firearms. I know that these individuals will sometimes utilize "straw" purchasers to obtain firearms. These "straw" purchasers assist prohibited persons with circumventing existing regulations that prevent them from acquiring firearms legitimately. Often the straw purchasers may themselves be prohibited from possessing or acquiring firearms but are able to circumvent existing laws and/or regulations through a variety of means, to include having a weapons permit, utilizing gun shows, or making misrepresentations on ATF Form 4473 (Firearms Transaction Record) during the acquisition of firearms.

4

c.  Individuals involved in illegal firearms trafficking will often conduct repeated purchases of firearms from different licensed firearm vendors and often will purchase the same make and model of popular firearms.

d.  In addition, the traffickers often maintain and have quick access to large amounts of currency or other liquid assets to maintain their business.  Increasingly, they transfer cash using electronic devices and applications, such as CashApp, Venmo, and PayPal.

e.  Firearms traffickers often use electronic devices to facilitate their illegal conduct.  For example, traffickers often maintain telephone numbers and addresses of clients and suppliers and keep those records readily available on electronic devices in order to efficiently conduct their trafficking or illegal distribution business. Firearms traffickers in many instances will "front" (that is, sell on consignment) firearms to their clients and keep records of items paid and owed. Increasingly, such records are electronic and are kept on electronic devices such as cellphones. These individuals will often use cellphones to photograph firearms to be sold or traded, to research firearms and pricing on the internet, to communicate with customers and suppliers via text messaging and messaging applications, and to conduct actual transactions for firearms.  Electronic devices can store information for long periods of time, and data can in some cases be recovered from a device even if it has been deleted by the user.

f.  It is common for individuals involved in the unlawful acquisition, possession, or transfer of firearms to attempt to hide their identities and whereabouts, including their current residence address, from law enforcement. Therefore, these individuals go through surreptitious means to acquire, possess, transfer, or sell firearms without complying with federal and state law. These means include listing a post office box,

5

using an address of an acquaintance or relative, or using a previous address as their current residence when completing paperwork required to lawfully purchase a firearm. Additionally, these individuals will often report the firearms stolen shortly after purchase. By doing these actions, these individuals attempt to thwart law enforcement efforts to trace firearms to their initial purchasers after they are recovered in a crime.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.      The property to be searched are a blue Apple iPhone, a beige Apple iPhone with grey case with various writing, and a black Apple iPhone with cracked back, referred to hereinafter as "**the Devices**." **The Devices are** currently located at the ATF Martinsburg Field Office's evidence vault in Martinsburg, Berkeley County, West Virginia.

9.      The applied-for warrant would authorize the forensic examination of **the Devices**, as described in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10.     On October 19, 2024, I received information from Richalie Demaine, owner of Green Monstah Firearms, LCC, located at 1514 Winchester Avenue, Martinsburg, West Virginia 25405, regarding the suspicious purchase of firearms by Christopher Seth STCLAIR. Ms. Demaine stated STCLAIR came into the store and requested to buy the same Ruger pistol he had purchased from Green Monstah Firearms in March 2024. When advised they did not have that model Ruger in stock, STCLAIR quickly picked another model Ruger and a Glock pistol, and then asked which ammunition the handgun takes. Ms. Demaine stated STCLAIR made statements believing he could

6

only purchase multiple handguns once month. Ms. Demaine stated STCLAIR was nervous and seemed very uncomfortable being in the store. He completed the ATF Form 4473, Firearm Transaction Record, and then quickly left, stating he would go sit in his car while the background was being run. Ms. Demaine stated STCLAIR then left the parking lot so quickly they were unable to tell which vehicle he left in. STCLAIR first filled the ATF Form 4473 out incorrectly and had to complete a new form when he returned, then again he left the area. Ms. Demaine stated she did not feel comfortable transferring the firearm to STCLAIR; however his background was in research and would be delayed. Ms. Demaine stated she advised STCLAIR his Brady date[1] was October 24, 2024, and he would not be able to take the firearms before that date unless his background cleared.

11.   He completed an ATF Form 4473 for a Glock 43, 9mm pistol, serial number AEWM445, and a Ruger LCP Max, .380ACP pistol, serial number R75-538888. He indicated that he was the actual purchaser of the firearms and that he was not a user of, or addicted to, marijuana or any other controlled substance. He listed his address as 505 Bowers Street, Martinsburg, West Virginia, 25428.

12.   On October 20, 2024, Ms. Demaine contacted me and advised STCLAIR had been calling the store checking on the status of his background check. Ms. Demaine stated she spoke with STCLAIR who sounded nervous and asked when he could come get his firearms. Ms. Demaine advised STCLAIR he would be contacted when his background cleared, but again advised him the Brady release date was October 24, 2024. Ms. Demaine stated a female could then

---

[1] Under the Brady Handgun Violence Prevention Act, a five day waiting period is authorized before a handgun is transferred to give time for a background check to be completed.

be heard in the background stating, "Tell her we have the cash and can come get the guns right now."

13.    On October 22, 2024, I received a call from Ms. Demaine who advised STCLAIR had again called the store the previous evening, October 21, 2024, and spoke with manager Dan Jones. STCLAIR questioned when he'd be able to pick up the firearms and expressed it wasn't fair he had to wait. Ms. Demaine advised STCLAIR's background had received a "proceed" overnight, but Ms. Demaine would delay the transaction further at my request.

14.    ATF Investigative Analyst Stacy Toup and I conducted queries of law enforcement databases and observed information publicly available on STCLAIR's Facebook page. STCLAIR identified his fiancée/girlfriend on his Facebook page as Autumn BURTON. I was able to positively identify this individual as Autumn Jade BURTON, a Maryland resident and narcotics user with multiple felony convictions out of Washington State. A query of the address STCLAIR used on his ATF Form 4473, reported as 505 Bowers Street, Martinsburg, West Virginia through law enforcement databases identified associations with known narcotics users.

15.    On October 21, 2024 and October 22, 2024, ATF Resident Agent in Charge (RAC) Jeannette Williamson and I made several attempts to locate STCLAIR at 505 Bowers Street, Martinsburg, West Virginia, with negative results.

16.    On October 22, 2024, I contacted the owner of 505 Bowers Street, identified as Douglas Miller via telephone. Mr. Miller advised STCLAIR has not resided at 505 Bowers Street. Mr. Miller stated the only resident at 505 Bowers Street is Randy Riley, who has  rented the residence for fifteen years and Mr. Riley lives there alone. Mr. Miller advised Mr. Riley's grandson, Christopher, is permitted to visit the residence occasionally but is not allowed to live there. Mr. Miller was aware of this individual having previously been in drug rehabilitation. I

8

advised Mr. Miller that there are two Christopher's associated with the address, Christopher STCLAIR and Christopher Dignazio. Mr. Miller was unaware of Christopher's last name.

17.    On October 22, 2024, RAC Williamson and I interviewed Randy Riley at his residence located at 505 Bowers Street, Martinsburg, West Virginia. Mr. Riley confirmed he has resided at 505 Bowers Street for approximately fifteen years. Mr. Riley stated STCLAIR has never resided at the residence. Mr. Riley was aware of STCLAIR's name because he recently received mail for STCLAIR and returned it to the postal carrier. Mr. Riley stated Christopher Dignazio is his grandson, adding Dignazio is currently in a narcotics rehabilitation facility in Ohio. Mr. Riley stated Dignazio has never lived at the residence either. I showed Mr. Riley STCLAIR's West Virginia Driver's License photograph and Mr. Riley stated he did not recognize STCLAIR, but added STCLAIR looks like a "kid Christopher ran around with."

18.    On October 23, 2024, Ms. Demaine contacted me and advised STCLAIR had again called the store the previous night on October 22, 2023, checking on the status of his background, and was told the store would call him as soon as they knew something. Later on this same date, Ms. Demaine contacted me and advised STCLAIR had just called the store inquiring if purchasing a firearm at another store would affect his current background at Green Monstah.

19.    On October 24 and 25, 2024, Green Monstah Firearms began contacting STCLAIR and leaving messages at telephone number (240) 869-9128, advising STCLAIR his background check cleared and he could come pick up the firearms he initiated a purchase for on October 19, 2024.

*Straw Purchase Interdiction*

20.    On October 25, 2024 at approximately 2:26 PM, I received a call from Dan Jones, manager at Green Monstah Firearms, advising STCLAIR called the store and stated he was on his

way to purchase the firearms, and was passing Williamsport (indicating he was coming from Maryland). Mr. Jones advised STCLAIR also stated he may be switching out the firearms he originally selected for different firearms. Agents from the Martinsburg Field Office then responded to Green Monstah Firearms and established surveillance in the parking lot.

21.   At approximately 2:52 PM, ATF agents observed a silver Hyundai Elantra bearing Maryland registration 7GC0350 enter the Green Monstah parking lot and park at the north end of the parking area adjacent to the gun store. A vehicle registration query identified this vehicle as being registered to David Lamont BARNES, of 1943 Harpers Ct, Frederick, Maryland 21702. A short time later a black Nissan Rogue bearing Pennsylvania registration MFF5619 registered to Autumn BURTON at 277 Park St, Waynesboro, Pennsylvania 17268 arrived and parked next to the silver Hyundai. Two black males, later identified as David Lamont BARNES and Donaven Eugene SIMMS, exited the silver Hyundai Elantra. STCLAIR was observed exiting the Nissan Rogue and meeting with BARNES and SIMMS at the front of the silver Hyundai.

22.   The three males then walked into Green Monstah Firearms separately; BARNES went in first, followed by SIMMS, and STCLAIR later. A white female, later identified as BURTON, was observed remaining in the driver's area of the Nissan Rogue. SA Seth Cox and RAC Williamson went into the store acting in an undercover capacity. SIMMS and BARNES were observed looking at Glock pistols and overheard asking if the store had a Glock 27 in stock. The salesclerk advised they were sold out of the Glock 27. SIMMS and BARNES acted as if they were shopping separately from STCLAIR, but the three were observed meeting together in the magazine isle. SIMMS, BARNES, and STCLAIR were observed texting and utilizing their cellphones while in the store.

10

23.    At approximately 3:21 PM, STCLAIR began filling out the ATF Form 4473, Firearm Transaction Record, for a Glock model 17 pistol, serial number CBUC713, on Green Monstah's computer terminal, while SIMMS and BARNES mulled about the store.

24.    STCLAIR listed his address as 505 Bowers Street, Martinsburg, West Virginia, indicated he was the actual purchaser of the firearm, and that he was not an unlawful user of, or addicted to, marijuana or any other controlled substance.

25.    At approximately 3:24 PM, SIMMS and BARNES exited the store and returned to the silver Hyundai where they remained until BCSO marked units arrived.

26.    After STCLAIR completed the ATF Form 4473 agents detained him and escorted him outside the store while Deputies with the Berkeley County Sheriff's Office ("BCSO") conducted a felony stop on the occupants of the Hyundai Elantra and Nissan Rogue. BARNES and SIMMS were called out of the Elantra and detained. BURTON was then called out of the Rogue and detained.

27.    A blue Apple iPhone was seized from SIMMS. Two cellular devices were seized from BARNES, a beige Apple iPhone with grey case with various writing, and a black Apple iPhone with cracked back. Cellular devices were also seized from STCLAIR and BURTON, and both provided consent for agents to search their devices.

*Interview of Autumn BURTON*

28.    I interviewed BURTON in the presence of BCSO Corporal ("Cpl.") Price. I advised BURTON she was not under arrest and verbally read BURTON her Miranda warnings in the presence of Cpl. Price.  BURTON stated she understood her rights and agreed to speak with me. BURTON stated STCLAIR asked her for a ride to Green Monstah to purchase a firearm. BURTON stated STCLAIR sent money to her Cash App account because he did not have his debit card.

11

BURTON stated the money was from STCLAIR's friend who owed him money. BURTON later explained that SIMMS sent STCLAIR two different transfers, one for $400 and one for $600. STCLAIR then sent the money from his Cash App account to her Cash App account, and she transferred the money to her Credit Karma account. BURTON stated STCLAIR texted her while inside Green Monstah and told her to send $600 back to him.

29.     BURTON stated she came with STCLAIR to Green Monstah the previous Saturday alone, and Donaven SIMMS and David BARNES were not there.

30.     BURTON stated she only smokes marijuana but acknowledged recently being charged in Pennsylvania for possession of fentanyl. BURTON stated she and STCLAIR smoke marijuana every day.

31.     BURTON denied being present during STCLAIR's October 20, 2024 call to Green Monstah Firearms and advising him to tell the salesclerk they had cash and could come get the firearms. BURTON stated she did not remember that occurring. BURTON later stated she and STCLAIR were together that whole weekend.

32.     BURTON stated the two males STCLAIR met at Green Monstah were his friends but did not know their names and had never met them before.

33.     BURTON acknowledged having multiple felony convictions, and stated STCLAIR researched the rules for having a firearm with her felony conviction and believed STCLAIR could legally possess a firearm if it was in a locked box. BURTON stated in 2019 she received her most recent felony conviction for aggravated assault. BURTON stated she wasn't sure STCLAIR was going to purchase a firearm that day and told her he was looking. BURTON insisted she was not involved in the firearm purchase and has been working hard to stay out of trouble for the sake of her daughter.

34.    When asked about her employment, BURTON stated she does on call independent shift work at warehouses. She stated STCLAIR recently started working at Ryder. I then concluded the interview.

35.    Approximately twenty minutes later, I reapproached BURTON who began talking. BURTON stated STCLAIR advised her he was meeting a friend in West Virginia and this friend owed him money. BURTON stated she didn't trust STCLAIR to take her car so she insisted on driving him to the gun shop. BURTON stated she didn't know the amount of money STCLAIR was receiving from his friend until she saw it come through on her card. BURTON gave STCLAIR her card to pull the money out at an ATM. I advised BURTON that STCLAIR stated he lied to BURTON about purchasing a firearm for himself, but she figured out he was lying before they arrived. I advised BURTON she would not be arrested at that time but if additional information was developed showing her involvement in illegal firearm activity she would be charged at later date. BURTON again denied knowing STCLAIR was purchasing a firearm for someone else, stating, "I'm not involved in any way. I don't know anything." BURTON agreed to provide consent to search her cellphone. BURTON inquired if she could get in trouble for anything that's on STCLAIR's phone because it is on her account. I advised BURTON she is only responsible for herself. BURTON stated she doesn't know what is on STCLAIR's phone and did not know what "they (STCLAIR, SIMMS, and BARNES) had going on." BURTON then added she "didn't know details" but "had a vague idea." BURTON stated she told STCLAIR he better not be doing anything "suspicious" and didn't want firearms around her because she is a felon. BURTON stated she has been to prison and does not want to go back and has been trying to do well the last few years.

*Interview of Christopher STCLAIR*

36.     RAC Williamson and I then interviewed STCLAIR. I verbally read STCLAIR his Miranda warnings in the presence of RAC Williamson.  STCLAIR stated he understood his rights and agreed to speak with agents. STCLAIR stated he has been arrested for marijuana possession and admitted to using marijuana daily. He admitted to using methamphetamine in the past, and stated he last used methamphetamine at the time of his May 2024 Driving Under the Influence arrest.

37.     When asked where he resided, STCLAIR stated he resides at his parents' house but stays with BURTON in Maryland. When asked about his use of the 505 Bowers Street, Martinsburg, West Virginia address he used on his Driver's License and ATF Forms 4473, STCLAIR stated he was kicked out of his parent's house at eighteen years old and had used his friend, Christopher Dignazio's address to get his Driver's License. STCLAIR acknowledged that he and Christopher Dignazio did not reside at 505 Bowers Street, but Dignazio's grandfather did. STCLAIR stated he's previously used that address on an ATF Form 4473 and was able to purchase a firearm so he "didn't think it was that big of a deal."

38.     When asked if he was aware that people who use narcotics, including marijuana, cannot legally purchase or possess a firearm, STCLAIR stated, "Yeah. It's common sense right." STCLAIR again admitted to using marijuana every day, and later to using methamphetamine frequently.

39.     STCLAIR stated he met Donaven SIMMS, who he knows as "D," at Ryder in Hagerstown, Maryland where STCLAIR has worked for approximately three weeks. STCLAIR first stated SIMMS and David BARNES met him at the store because they had never heard of it and were there to buy "clips." STCLAIR stated SIMMS and BARNES told him they couldn't buy

firearms in Maryland. When asked if they were convicted felons, STCLAIR stated, "I have no idea. I just met them."

40.   I advised STCLAIR agents were aware he'd received two Cash App payments of $400 and $600 from SIMMS and BARNES earlier in the day, STCLAIR claimed he loaned them $900, and they were repaying the loan. I then advised STCLAIR to be honest, to which STCLAIR stated, "I came here, yes you're right, I'm fucking lying to you." STCLAIR then admitted, "I came here to get them (SIMMS and BURTON) a gun," STCLAIR stated he was purchasing a firearm for them because he owned them money. STCLAIR stated SIMMS and BARNES are "weed" dealers and fronted STCLAIR and ounce of weed; later adding he had a debt of $280. STCLAIR stated he was purchasing the firearms as an easy way of repaying the debt. STCLAIR stated SIMMS and BARNES sent him $1,000 on Cash App because they wanted him to purchase another firearm. STCLAIR stated he was to purchase a Glock 17 for SIMMS and two Glock 20's for BARNES. STCLAIR then added that the store didn't have the Glock 27s in stock. STCLAIR was unaware of BARNES name but knows him as SIMMS brother. STCLAIR stated the Ruger he planned to purchase on October 19, 2024 was for SIMMS.

41.   Cash App is a platform which allows users to send or receive money.  It is frequently utilized via an application on a user's cellular device.

42.   STCLAIR stated the Ruger .380 he purchased at Green Monstah Firearms in March of 2024 is at his parent's house, adding that he has not purchased any other firearms.

43.   STCLAIR stated he has been buying marijuana from SIMMS since he started working at Ryder. STCLAIR stated he last used methamphetamine the day prior, on October 24, 2024, adding he does not use daily but goes on a "binger."

44.     STCLAIR stated he lied to BURTON and told her he needed a ride to Green Monstah to purchase a firearm for himself, but BURTON figured out what he was doing and he told her the truth.

45.     STCLAIR stated SIMMS and BARNES live at the Courtland Apartments in Hagerstown, Maryland. STCLAIR stated he stays with BURTON at 181 S. Prospect, Apartment 8, in Hagerstown, Maryland.

46.     STCLAIR provided consent for agents to extract his cellphone.

*Interview of Donaven SIMMS*

47.     SA Brian Damiani and SA Seth Cox interviewed Donaven SIMMS. SA Cox advised SIMMS that he was not under arrest and was being detained. SA Cox advised SIMMS of his Miranda rights and SIMMS agreed to speak. SIMMS initially stated that he did not come down to the shop to buy any guns only to look at them and denied STCLAIR was buying the firearm for him. SIMMS then confirmed that he and BARNES paid STCLAIR $1000 to buy a Glock. SIMMS stated that he gave STCLAIR $400 and BARNES gave STCLAIR $600 for the firearm and STCLAIR was to keep the difference as payment for the sale. SA Cox asked SIMMS why he did not purchase the handgun in Maryland himself. SIMMS stated that he did not know the process for buying a gun in Maryland and he did not have a "gun license." SA Damiani asked SIMMS if he gave STCLAIR any drugs in addition to the money for the firearms. SIMMS stated that he did not. SIMMS stated that he smokes marijuana and had smoked marijuana the previous night (October 24, 2024).

48.     SIMMS stated he worked with STCLAIR a Ryder truck rental in Hagerstown. SIMMS stated that he believed STCLAIR lived in Hagerstown.

16

49.     SIMMS stated that he was on unsupervised probation in Maryland for a reckless endangerment misdemeanor conviction from about two years ago.  A review of Maryland Case Search indicates that SIMMS pled guilty to Reckless Endangerment on September 15, 2022, and received Probation Before Judgment and 18 months of unsupervised probation.

50.     SA Cox and SA Damiani attempted to interview David BARNES, however after reading BARNES his Miranda warnings he declined to answer any questions.

51.     STCLAIR, SIMMS, and BARNES were arrested by the BCSO for solicitation of a firearms dealer and conspiracy and transported to the Eastern Regional Jail. BURTON was released but advised she may be charged at a later date.

## The Devices Location

52.     **The Devices** are currently in the lawful possession of the ATF. I took custody of **the Devices** at the time of STCLAIR, SIMMS, and BARNES' arrest on October 25, 2024.

53.     I seek this warrant for an examination of **the Devices**, which will comply with the Fourth Amendment and other applicable laws.

54.     **The Devices** are currently in storage at the ATF Martinsburg Field Office in Martinsburg West Virginia, which is within the Northern District of West Virginia. In my training and experience, I know that **the Devices** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when **the Devices** first came into the possession of the ATF.

## TECHNICAL TERMS

55.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital

cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated tophotographs or videos.

c.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives.  This

19

removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

56.    Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as wireless telephone, digital camera, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type

can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

57.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

58.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use,

who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

59.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

60.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for theCourt to authorize execution of the warrant at any time in the day or night

### Conclusion

61.     In my training and experience, I know that firearms traffickers or people who are prohibited from possessing firearms often use "straw purchasers" to initially purchase firearms from FFLs to conceal their identities within the trafficking process. I know that these firearm sales are brokered utilizing cellular phones to make contact and arrange meetings places for sales or transfer of the firearms after purchased by the straw purchaser at the respective FFL.

62.     Additionally, I know from my training and experience that a smartphone is used to provide GPS directions, native or secondary application, to **the Devices**. The location of **the Devices** is often logged during the communication with the cellular network and the satellites and embedded within **the Devices**.  I know from my training and experience with cellular phone examinations that persons often utilize GPS based applications to provide directions, even when traveling on foot. I also know that photographic content within **the Devices** often contain metadata which can log GPS coordinates or locational data.  I know from training and experience that often times this data will be supported by GPS data within **the Devices.**

63.     A physical search of the contents of **the Devices** is only a search analysis of the data contained within the device and not the cellular provider data which would be obtained through a separate legal demand. It is anticipated that GPS location information will be located in **the Devices.**

64.     I respectfully submit this affidavit contains probable cause for a search warrant authorizing the examination of **the Devices** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

LAUREN
SCOLL

Digitally signed by
LAUREN SCOLL
Date: 2024.11.05 15:12:35
-05'00'

Lauren Scoll
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives.

Subscribed and sworn to before me on November 5, 2024

UNITED STATES MAGISTRATE JUDGE
ROBERT W. TRUMBLE

24